Harvey D. BANKS

v.

Margaret M. HECKLER.

No. 82–2514–CV–SPELLMAN.

United States District Court,
S.D. Florida,
Miami Division.

May 24, 1985.

---

Lyle D. Lieberman, Miami, Fla., for plaintiff.

Michael Burnbaum, Asst. U.S. Atty., Miami, Fla., for defendant.

## FINAL ORDER

SPELLMAN, District Judge.

Upon the Report and Recommendation of a United States Magistrate, and upon an independent review of the file, it is now ORDERED that:

1. The Report and Recommendation are APPROVED, and

2. The Secretary's Motion to Remand for new hearings is DENIED. *Stewart v. Heckler*, 599 F.Supp. 298 (S.D.N.Y.1984); *Claassen v. Heckler*, 600 F.Supp. 1057 (D.Kan.1985), and

3. The Plaintiff's Motion for Judgment is GRANTED, and the cause is REVERSED, with direction to pay Harvey Banks disability benefits from August, 1981.

## REPORT AND RECOMMENDATION

PETER L. NIMKOFF, United States Magistrate.

This is a review of a final decision of the Secretary denying Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. All administrative remedies have been exhausted. Jurisdiction arises under 42 U.S.C. § 405(g).

Now pending is Plaintiff's motion for judgment. The cause has been referred by the Honorable Eugene Spellman, District Judge, for review and recommendation. For the following reasons, it is RECOMMENDED that the motion be granted, and the decision of the Secretary be reversed.

## PROCEDURAL HISTORY

Harvey D. Banks was originally determined "disabled" within the meaning of the Social Security Act on November 16, 1973. On October 10, 1981, he was notified that his disability was considered terminated as of August, 1981. Plaintiff appealed that determination and an administrative hearing was held on May 10, 1982. The Secretary decided the claim adversely to Mr. Banks who then filed suit. The transcript of the administrative hearing could not be produced and the matter was, therefore, remanded for a second administrative hearing. Such hearing was held before the same Administrative Law Judge, Jerome E. Lowen, on February 1, 1984—two and one-half years after the alleged date of cessation.

The second hearing also resulted in a decision adverse to the claimant. The Appeals Council adopted that decision from which Plaintiff now appeals.

## STANDARD OF LAW

▮ The pertinent standard to be applied in a disability cessation case is whether, upon comparison of the original medical evidence and the medical evidence at the time of cessation, the claimant has improved to the point of no disability. *Vaughn v. Heckler,* 727 F.2d 1040 (11th Cir.1984); *Simpson v. Schweiker,* 691 F.2d 966 (11th Cir.1982).

In the instant case, however, after careful and thorough evaluation of the evidence, it is the conclusion of the undersigned that even without comparison of the prior medical evidence it is plain that Mr. Banks was totally and permanently disabled in and after August of 1981. Thus, it is unnecessary and not in the interest of judicial economy for this Court to recount and discuss the earlier medical evidence.

## MEDICAL EVIDENCE

Plaintiff was determined "not disabled" as of August, 1981. The record contains medical evidence and documentation going as far back as 1972. As explained above, the most relevant evidence, for purposes of this review, is that closer in time to the date of termination. Beginning in May of 1981 the record contains numerous reports from an array of doctors.

Dr. James G. Stewart, a neurologist, provided a report in May, 1981 to the state worker's compensation bureau. He indicated that Mr. Banks was referred to him for a neurological consult at the request of Dr. Allen de Olazarra as a result of total body pain. (R. 222). Mr. Banks, a former fireman, had been injured in 1970 falling off a firetruck and landing on his behind. He was also hit by a 70 lb. fire hose. He had severe pain, disc injury and compression fracture of the lower spine. For medical reasons, Mr. Banks retired in 1974 with complaints of persistent headaches, earaches, dizziness and pain all over his body.

According to Dr. Stewart's report a laminectomy was performed in 1977 by Dr. Guido who then discovered neurofibromatosis. Dr. Maynard Taylor performed a bilateral rib resection. Mr. Banks was currently complaining of constant pain in his right shoulder and arm, low back, right buttock and leg. He experienced back spasms and his pain greatly increased with any activity at all. Mr. Banks' headaches occurred about once a week and did not respond to Percodan or Inderal.

Upon examination Mr. Banks had fairly good lateral rotation of the cervical spine with discomfort upon neck extension. Straight leg raising was uncomfortable to any degree on the right, worsening at 80°. It was full on the left. Flexion was also uncomfortable worsening at 30–40°. Vigorous movement of the back or legs caused distress. Pain medication included four Robaxin per day, four Synalgos and one-two Fiorinal III.

Motor examination showed no drift, good strength except in extension of the great toes. Left biceps jerk was diminished to the right. Doctor Stewart concluded that he could make no absolute diagnosis until he received medical records but he gave the following diagnostic impression:

Subjective pattern of total body pain including headache, both arms and legs, worse in the right than in the left, chest, low back and neck with a history of "von Recklinghausen's disease" apparently documented at surgery, with current findings limited to reflex changes in the left biceps, right knee jerk and some evidence for bona fide weakness of the toe extensors, right greater than left.

(R. 224). There is no subsequent report from Dr. Stewart.

In August of 1981 Mr. Banks was examined by Dr. Peter Millheiser, an orthopaedic surgeon and a consultant for the Social Security Administration. He reported that Mr. Banks had mild restriction of the cervical spine, no motor or sensory loss in the upper extremities (except some patchy hypesthesia on the right), normal grip

strength, no spasm. Mr. Banks lacked 30° of flexion and 5° lateral bend of the lumbar spine. Straight leg raising was reported as negative when sitting and distracted; positive at 70° lying down. Gait is normal. X-rays showed mild osteoarthritic changes of the cervical spine. Dr. Millheiser concluded:

> Patient has had a cervical sprain in the past. The fracture noted at T12 was not visible on X-ray ... I feel that the patient is able to do light activities. He can lift up to 15 pounds. He should not do any repetitive bending or lifting.

(R. 226). At the hearing Mr. Banks stated that Dr. Millheiser saw him for a total of 3 minutes. The nurse attended him but only to take X-rays.

There is a report-of-contact form dated August, 1981. Dr. Allen de Olazarra reported to the Social Security Administration that Mr. Banks had a diffuse pain pattern involving virtually all areas of the body, more evident in neck, lower back and head. He described Mr. Banks' pain as "almost constant" and fairly controlled with Synalgos. He described treatment and response as "poor". (R. 227–230). He indicated that the results of a neurological examination were enclosed but no such report appears in the record.

Medical notes of Dr. Laurence J. Guido, the neurologist who performed surgery on Mr. Banks, are also in the record. They cover the period August, 1977 to November, 1981.[1] In August, 1977 Dr. Guido noted that post surgery, it was his impression that he was not fully certain of the etiology of Mr. Banks' pain. In October, however, a body delta scan of the cervical and thoracic spines showed a compression fracture of the 6th thoracic vertebrae. The matter was referred to Dr. Russell. A year later Mr. Banks returned with similar complaints of pain and dizziness. In addition, he complained of a numbness in the left face extending through the left arm.

Mr. Banks had been seen in a hospital emergency room that morning for pain.

Upon examination, strength was intact, full range of motion in the neck. Facial movement was normal. There was mild paraspinal muscle spasm, greater at the right. Percodan was proscribed and an EEG sought from Dr. Russell. The EEG proved abnormal and a brain scan was indicated.

In December of 1978 Dr. Guido again reports complaints of severe pain by Mr. Banks. The doctor felt that an EMG was warranted and nerve conduction velocities of the upper extremities. He stated that Mr. Banks had previously been diagnosed as having thoracic outlet syndromes (and had rib resections). He was concerned that there was a disc problem or neuromas. Referral was made to Dr. Marshall Able.

In April, 1979 Mr. Banks had forgotten to see Dr. Able. He reported having headaches—more frequent, more severe, neck and shoulder pain, mid dorsal pain and tight lumbar muscles. Pain behind both knees had recurred and was stronger. He had had to get emergency treatment with Vistaril and Dilaudid at Coral Reef Hospital a few weeks earlier. Currently he was taking Aspirin since Dr. Guido felt that Percodan "would tend to addict him". (R. 238).

Paraspinal muscle spasm was noted upon examination. Neck extension, according to Mr. Banks, would trigger severe headaches. He could flex his head to his chest and 10 degrees either way. There were no motor abnormalities though there was some loss to pin prick sensation over both upper extremities. Norflex was prescribed.

In September, 1979 results were reported as good with Norflex. Darvocet-N 100 was also prescribed. Some pain and muscle spasm was present.

In October, 1979 Mr. Banks had become nauseated from the Darvocet, was still in

---

1. At this time Dr. Christian Keedy, the Medical Advisor called by the Social Security Adminis- tration, was associated with Dr. Guido.

considerable pain. Parafon Forte was prescribed and hypnosis recommended for pain.

In December, Mr. Banks reported that the Parafon Forte did not work. Darvocet was again proscribed. X-rays showed mild spur formation at C4–5 but were otherwise normal. Dr. Guido found some diffuse hypalgesia over the right arm but reported there were no "overt problems at this point."

In February of 1980 Mr. Banks was seen again by Dr. Guido. He was complaining of pain all over his body with numbness on the left. A pain clinic was recommended.

In November of 1981 Mr. Banks reported constant headaches, neck pain which radiated to the shoulders and arms, bilateral anterior chest pain, low back pain radiating to the legs. No change in status was reported.

Medical notes of Dr. William Russell, Plaintiff's treating neurologist, cover the period April, 1973 to January 1982. In 1975 Dr. Russell diagnosed cervical L5–S radiculitis and headaches secondary to persistent muscle spasm with occipital neuralgia. He felt that Mr. Banks was totally and permanently disabled due to neck and low back pain, weakness of the right leg and upper extremities and headaches. Activity was found to intensify it.

In June of 1977 Mr. Banks was seen again after a two-year lapse. Mr. Banks reported constant, unrelieved pain. A TMS unit proved of little help. Dr. Russell noted:

> His pain in the low back is constant, aggravated by bending, coughing, standing and sitting. He does gain some relief by reclining and sleeps on his side with his knees tucked and a pillow between his legs.

(R. 257). Mr. Banks had lost 30–40 pounds, was depressed and taking 3–4 Percodan (plus Tylenol # 3) a day. Mr. Bank's wife stated that he had greatly worsened and she was fearful he would kill himself. He couldn't eat, stayed in his room and

talked of dying. He wouldn't see friends and made preparations for death. He would not see a psychiatrist.

Dr. Russell described Mr. Banks as appearing chronically ill, stooped and having prominent muscle spasm. Sciatic tenderness was noted bilaterally and there was a straightening of the lumbar lordosis with mild scoliosis. Straight leg raising was 70° with pain. Lumbar flexion was 45–50° with severe pain. Chronic lumbar discogenic disease was diagnosed as well as chronic musculoligamentous strain. A repeat myelography was sought.

In December, 1977 complaints were the same. In October, 1978, an abnormal EEG was reported. In July, 1980 Dr. Russell reported complaints of pain in the right arm of increased intensity with slight diffuse weakness, pain and weakness in right lower leg with paresthesias, headaches of "blinding" intensity, twitching in the chest, pain lateral to the site of the old compression fracture, numbness in the right toes, occasional numbness of the left thigh.

Upon examination the doctor noted that Mr. Banks exhibited some signs of chronic illness ("somewhat pale"). There was spasm and tenderness over parts of the spine, restricted motion of the head and neck, some decreased response to pinprick in the left leg. The patient stood erect and Romberg's sign was negative.

Dr. Russell concluded that there were "no current findings suggesting any progressive or focal neurologic lession of a new disorder." He set as a goal the reduction of pain without narcotics, possibly DMSO.

In November of 1981 Dr. Russell described Mr. Banks' condition as unchanged. He listed the disorders as (1) multiple neurofibromas involving the left S1 and right S1 roots, (2) C6 or C7 radiculitis, etiology either discogenic or related to his neurofibromatosis, (3) post-traumatic bilateral compressive brachial plexopathy requiring transaxillary first rib resections, (4) seizure

disorder, etiology undetermined,[2] (5) compression fracture of dorsal spine, D6 and (6) headaches secondary to cervical muscle spasm.

Upon examination Dr. Russell noted that Mr. Banks moved with considerable difficulty and complained of headaches and pain. Several small neurofibromas were detected on the right flank. There was prominent spasm of the posterior cervical and shoulder girdle muscles. Range of motion of the head and neck was moderately restricted. Straight leg raising was restricted to 40–50 degrees. Dr. Russell described the patient as depressed and in a great deal of pain. He opined that Plaintiff was totally and permanently disabled.

In response to interrogatories in April 1982, Dr. Russell stated that Mr. Banks' condition met the Listing of Impairments, Section 1.05 (Disorders of the Spine), subsection (C) as of May, 1970. He stated that Mr. Banks' complaints of pain were credible and consistent with the medical findings. Mr. Banks could not, in Dr. Russell's view, perform sustained work.

A follow-up report in November of 1983, reported that Mr. Banks suffered persistent dizziness and lightheadedness, urinary incontinence and bowel trouble, severe muscle spasm and difficulty sleeping. His examination revealed:

"[P]ositive findings ... of muscle spasm involving the posterior cervical and shoulder girdle muscles bilaterally, a little more so on the right and straightening of the lumbar lordosis with lumbar paraspinal muscle spasm, tenderness and positive SLR at 35–40 degrees [bilaterally]. There is sciatic nerve tenderness bilaterally, There is reduction of the right ankle jerk. The remainder of the reflexes are symmetrically hypoactive. There is restricted movement of the head and neck to right and to left which is moderate. Pressure on the cranial vertex accents pain at the base of the skull and in the cervical region.

(R. 284). Medications were Dilantin, Xantac, Elavil and Darvocet–N–100.

Dr. George Hanna, psychiatrist, submitted a report dated January 18, 1984. He indicated that Dr. Russell had referred Mr. Banks to him in June of 1983 because he was "severly depressed and possibly suicidal" due to his physical difficulties. At that time Mr. Banks was suffering from a severe Post Traumatic Major Depressive Disorder. Dr. Hanna had been seeing Mr. Banks twice a week since then and continued to do so. He found little improvement during that time and noted that Mr. Banks felt hopeless about his condition. The doctor failed to discuss Mr. Banks' mental impairment in any detail but, rather, discussed his physical ailments at length. He stated his opinion that Mr. Banks was a very hurt individual who sincerely desired rehabilitation.

The record also contains a Physical Capacities Evaluation by Dr. Millheiser dated April, 1982. He indicates that Mr. Banks could sit four hours at a time, eight in a day; stand two hours at a time, three in a day; walk two hours at a time, three in a day. He could lift up to ten pounds frequently, 11–20 pounds occasionally, can carry the same. He could do simple grasping, pushing and pulling of hand controls and fine manipulation. He could not climb or reach. Dr. Millheiser felt that Mr. Banks could perform both light and sedentary work on a sustained basis.

At the administrative hearing the ALJ called Dr. Christian Keedy, neurologist, as a medical advisor. Plaintiff's attorney stipulated to his qualifications and stipulated further that he was "the most outstanding neurosurgeon in Florida." Dr. Keedy was not present when Mr. Banks' treating physician testified. Counsel objected to this but the Administrative Law Judge ruled it unnecessary to have Dr. Keedy listen to Dr. Russell.

Dr. Russell testified that he had treated Plaintiff since 1973 and had last examined him in January, 1984. He further stated that Mr. Banks showed no improvement from January, 1979 through 1981 (the year

---

**2.** Plaintiff had suffered a seizure during a hospitalization.

of termination). He found Plaintiff's complaints to be credible and noted that muscle spasms, in particular, cannot be manufactured by a patient. He stated that Plaintiff's physical problems were a visibly determined cause of the symptomatology—pain. The reasons for pain were the multiple neuromas in the back involving nerve roots and the residual effects of surgery—chronic muscle spasms, headaches and restricted movement.

Dr. Russell further indicated that not all pain restricts motion. It is possible to have a full range of motion and still experience pain.

In 1980 and 1981 Dr. Russell prescribed Linditrol, a muscle relaxant anti-depressant and Zomax, an anti-inflammatory analgesic. Zomax, he stated, is an alternative to narcotic medications. Prior to that, Mr. Banks had taken Inderal, Tylenol III and others.

Dr. Russell indicated that Plaintiff's problem was primarily neurological and not orthopedic. Plaintiff's counsel questioned the doctor regarding Dr. Millheiser's report wherein Dr. Millheiser noted that Mr. Banks had no muscle spasm. Dr. Russell took issue with that report stating that he had *never* seen Mr. Banks without finding muscle spasm. He said "I hardly see how you can put a hand on his back or his neck and not find it." (R. 60–61).

Dr. Russell further stated that for the period of August, 1981 and immediately prior thereto, Mr. Banks could sit a maximum of two hours with frequent rests, stand one hour with frequent rests in an eight-hour day. He stated that this assessment had not changed. Also, he indicated that Mr. Banks could lift 10 pounds only on occasion, e.g., pouring milk.

Dr. Keedy then testified as a medical advisor. Based on the records, he stated that Mr. Banks had neurofibromas as revealed by surgery and had had rib resections which "modified his symptoms to some degree, but really didn't relieve the continued complaints of pain in his back and in his arms." (R. 68). On an objective basis, Dr. Keedy noted, Plaintiff really did not have a great deal of disability that

could be assessed. Movement of the lower extremities was intact. There was little sensory disturbance, muscle tightness in the neck and lower back and limitation of motion of the head due to pain.

With respect to Mr. Banks' loss of function, Dr. Keedy felt that this was a matter of individual assessment. The Administrative Law Judge referred to Dr. Millheiser's report in particular and asked Dr. Keedy if there was anything in that report which would lead him to conclude there was a degree of disability. Dr. Keedy stated that the report revealed neuromas, surgery and complaints of pain which "would make one feel that certain activities would be painful and be limiting." However, he agreed, on the basis of Dr. Millheiser's report with Dr. Millheiser's conclusion, i.e., Mr. Banks could do light work.

Dr. Keedy then read Dr. Russell's report of July 18, 1980 and stated:

[Mr. Banks] is complaining of multiple areas of pain, but fundamentally, the headaches of which he complains, the neck pains of which he complains and the—pain in upper extremities would all be associated with the residual of his thoracic outlet syndrome. The pain that he complains of in his—in his dorsal region of his back where he shows x-ray evidence of having compression fracture, if of an unusual description. And it makes one think that when I may have some discomfort there, that it is magnified by his basic personality structure of being more sensitive and has more mental response to pain than one ordinarily would have in an old condition of long standing. The pain of which he complains of in his lower extremitity is reason to believe that one that has had a back operation and was bound to have neuromada of the S–1 nerve root would be significantly suffering with pain. So that I think that these claims are verified by his physical condition, even though some individuals might be able to overcome this somewhat more than he does.

Dr. Keedy stated further that Mr. Banks' current medication—Darvocet and Nor-

flex—were relatively mild pain relievers. He continued that physicians can be reluctant to use strong medications in chronic pain cases due to possible addiction and the probable raising of the pain threshold level.

Dr. Keedy stated, in response to questions from the Administrative Law Judge that Plaintiff could not sit or stand long enough to perform light work. He stated that Plaintiff could lift ten pounds [3] and sit if able to periodically change position. Upon questioning from the Administrative Law Judge, Dr. Keedy felt that the degree of Mr. Banks' pain would not preclude sedentary work.

Upon questioning by Plaintiff's attorney, Dr. Keedy indicated that the absence of muscle spasm or the presence of a full range of motion does not mean that a subject has no pain. He said each individual must be evaluated separately for pain. Dr. Keedy agreed with Dr. Russell's diagnosis and agreed that there was clearly a medical basis for Mr. Banks' complaint of pain. Dr. Keedy made it plain that the long term treating physician was in the best position to evaluate residual functional capacity particularly as against one who had never seen the patient (i.e., himself).

The Administrative Law Judge stated, at one point, that Mr. Banks had "credible pain" and was "significantly disabled". He later stated that "if I find that his pain is credible to the extent that he will testify to in a little while, then the man is clearly disabled." (R. 89).

Dr. Keedy continued to testify that the severity of pain is relative to a person's tolerance. He agreed that if Mr. Banks couldn't tolerate his pain he could not even do sedentary work. The doctor also stated that if Mr. Banks had been taking narcotics then this might indicate that his pain was more severe than it now appeared.

Mr. Banks testified also. He stated that he was 44 years old and has a GED. In August of 1981, he weighed 125 pounds and suffered from the same problems he suffers now: severe headaches with sharp, shooting pain, tightness and pounding, muscle spasms in the neck, shoulder and back, radiating pain and inflammation, pain in the low back radiating to the legs and from the tailbone to the scrotum, dizziness, memory problems, mental confusion and fatigue. Mr. Banks also stated that he has chronic sleeping problems, constipation and diarrhea and bladder difficulty. Mr. Banks was seeing Dr. de Olazarra in August, 1981 and Dr. Russell. Mr. Banks testified that in August of 1981, he could not stand, walk or sit any longer than he can now. He could not bend without difficulty. Sometimes he was unable to take care of his personal needs. He spent a lot of time in bed as he does now, getting heat treatments prescribed by Dr. Russell.

Mr. Banks said his condition has worsened. He also stated that he had been getting up many times during the hearing due to pain.

In 1980 and 1981 Mr. Banks stated he had gone to at least three emergency rooms due to extreme pain. The Administrative Law Judge desired documentation of this (which was not presented).

Mr. Banks testified that his wife and daughter do all household chores. He stated that the only drugs that had helped the pain were Dilaudid and Percodan. He was taken off Percodan for fear of addiction. The Zomax was of no help.

Mrs. Banks also testified at the hearing. She corroborated her husband's testimony and further indicated that he is extremely fatigued so that he frequently goes to bed. She indicated that he had not improved since 1974 and that he can't even go anywhere or do the slightest things. She stated that her husband has never, since 1974, experienced a day without pain.

### ADMINISTRATIVE DECISION

In his decision denying benefits, the Administrative Law Judge found that Mr.

---

**3.** Later, Dr. Keedy stated that Plaintiff could do sedentary work if he "didn't have to do *any* lifting." (R. 88)

Banks possessed only two impairments: headaches and cervical and lumbar pain syndrome. He apparently ignored the other diagnoses which even the medical advisor ascribed—multiple neurofibromas, bilateral compressive brachial plexopathy. He also failed to consider depressive reaction. He found that beginning in August, 1981 Mr. Banks' RFC improved to the point where he could perform sedentary work. He then applied the Medical-Vocational Guidelines, Rule 201.28 to conclude that Plaintiff was not disabled.

In support of his decision, the Administrative Law Judge pointed to the report of Dr. Millheiser to support a conclusion that Plaintiff could do sedentary work. He made no reference at all to the testimony of Dr. Keedy. With respect to Mr. Banks' complaints and pains, the Administrative Law Judge stated:

> "[T]he Administrative Law Judge finds that the claimant's allegations of pain are credible, but not to an extent that they preclude him from basic work activities.... Dr. Millheiser ... determined the claimant has the capacity to sit for eight hours during an eight hour working day, and can stand and walk part of the day. Although there are opinions from Dr. Russell to the contrary, and although the Administrative Law Judge realizes that Dr. Russell has seen the claimant on a regular basis, Dr. Russell's opinions do not take into effect the claimant's residual functional capacity based upon medical findings ... Dr. Russell noted the claimant's complaints, but did not pinpoint the basis for the multiplicity of complaints about pain.... Dr. Millheiser took the pain into effect when he rendered his physical capacities evaluation. Extensive testing has been done with respect to claimant's allegations of pain ... The medical evidence does not substantiate a find [sic] that these pains in and of themselves are totally disabling. Also, although the claimant has some spurring and other deformities on x-ray examinations, these do not singly or in a combination lead to a conclusion that the claimant is entirely preoccupied

by pain. Such a conclusion is corroborated by the observations the Administrative Law Judge made at the hearing. The claimant was appropriately dressed and he entered and left the hearing room without apparent difficulty. The claimant testified that he has a driver's license and.... and drives his car one or two times a week. He said that on one occasion he went to the store to buy a ten pound bag of puppy chow, and he bought it, took it to his car and bought [sic] it home with him. The claimant certainly exaggerated when he told the Administrative Law Judge he could sit for only ten minutes.... The hearing ... lasted approximately 3 times that ...

(R. 36–37).

## RECOMMENDATION

After thorough examination of the record in this cause and careful scrutiny of the Secretary's final decision it is recommended that the decision of the Secretary be reversed as unsupported by substantial evidence.

█ It is well settled in the Fifth and Eleventh Circuits that pain alone can be disabling even when its existence is unsupported by objective medical evidence provided that it is linked to a medically determinable impairment. *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir.1982). *Simpson v. Schweiker*, 691 F.2d 966, 970 (11th Cir.1982); *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir.1981).

█ There is simply no substantial evidence to support the Administrative Law Judge's decision that Plaintiff's pain is not disabling, i.e., not severe, persistent or intractable. Courts in the Eleventh Circuit have pointed to a number of factors which are relevant to a determination of the disabling nature of subjective complaints: (1) whether the complaints are consistent over time and made outside of the claim for benefits, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir.1979); *see also Lynn v. Schweiker*, 565 F.Supp. 265, 268 (S.D.Tex. 1983); (2) whether the complaints are cor-

roborated by family members or other witnesses, *Arnold v. Heckler,* 732 F.2d 881, 884 (11th Cir.1984); *Scharlow,* 655 F.2d at 645; (3) whether those closest to the claimant believe the complaints to be sincere, *Simpson,* 691 F.2d at 970; (4) whether the claimant seeks treatment for pain, *Arnold,* 732 F.2d at 884; (5) whether an examining physician or psychiatrist offers an opinion regarding pain, *Id.* (noting that no doctor had offered the opinion that claimant's pain was disabling and noting that doctors commented on exaggerated nature of complaints); *see also, Jerabek v. Heckler,* 734 F.2d 726, 727 (11th Cir.1984); (6) whether—and to what degree—a claimant believes he or she can perform work related functions, *Reeves v. Heckler,* 734 F.2d 519, 524 (11th Cir.1984); (7) whether treatment for pain is aggressive or requires the use of narcotics, *Falcon v. Heckler,* 732 F.2d 827, 832 (11th Cir.1984); *Harwell v. Heckler,* 735 F.2d 1292, 1293 (11th Cir.1984); (8) whether daily activities are consistent with severe pain, *Harwell,* 735 F.2d at 1293. In the instant case, each one of the above factors, upon examination, supports a finding of severe, intractable pain. Over a significant period of time, Plaintiff complained of the same symptomatology to a host of doctors. He did so whether or not the examination was for social security purposes. Not a single doctor suggested that Mr. Banks exaggerated or was a malingerer. Indeed, each physician who treated Plaintiff did so on the apparent assumption of the truthfulness of his complaints. Mr. Banks' psychiatrist offered his view that the claimant was very sincere in his complaints. Mr. Banks' wife corroborated his testimony and stated that he has never had a day without pain. She discussed his very limited activities and his constant, severe fatigue. Mr. Banks' primary treating physician testified at the hearing that Mr. Banks' pain was disabling and he submitted well documented reports of claimant's clinical findings and impairments. Dr. Guido had performed surgery and further surgery had been recommended by Dr. Auld, though Plaintiff declined such in view of the risk. (R. 110). Narcotics had been used to treat

Mr. Banks during the relevant time and when narcotics were not used the reason was not that the pain was less than severe but rather that narcotics are addicting and can lower the pain threshold. Thus, treatment of Mr. Banks' pain was aggressive.

Mr. Banks testified as to his belief that he could not work. He also testified in depth and graphically regarding his pain. Both his treating physician, and the medical advisor called by the Social Security Administration stated that his subjective complaints were consistent with the diagnosis and clinical findings. There were also repeated *objective* signs of pain; limited motion, positive straight leg raising, weight loss, muscle spasms.

■ Contrary to the Administrative Law Judge's conclusions, Mr. Banks' daily activities do not support a finding of no severe pain. Driving a car twice a week, sleeping most of the day and carrying a bag of dog food do not evidence the absence of severe pain. Clearly these limited activities are a drastic departure from routine daily functions.

Additional reasons further suggest that the A.L.J.'s decision regarding pain was erroneous. The A.L.J. felt that Mr. Banks' complaints were credible only to a point. He noted that Mr. Banks had said he could sit only for ten (10) minutes but that he sat through a thirty (30) minute hearing with "no problems." The transcript of the hearing, however, is devoid to any claim by Mr. Banks that he could sit no more than ten minutes. The Transcript includes an interchange between counsel and claimant which establishes that Mr. Banks had gotten up several times during the hearing due to pain. (R. 110). The A.L.J. noted that claimant could take care of his personal needs; Mr. Banks had testified, however, that he could do so only "sometimes". (R. 106).

■ In addition the A.L.J. also applied a "sit and squirm" index in his evaluation of Plaintiff's pain. *See e.g. Freeman v. Schweiker,* 681 F.2d 727 (11th Cir.1982).

He noted that Plaintiff was appropriately dressed and was in no "apparent distress". Such an assessment of the degree of claimant's pain is impermissible. As stated in *Freeman,*

> In [the "sit and squirm"] approach, an Administrative Law Judge who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of the index, the claim is denied. As the court observed in *Tyler* [*v. Weinberger,* 409 F.Supp. 776, 789 (E.D.Va.1976) ] this approach will not only result in unreliable conclusions when observing claimants with honest intentions, but may encourage claimants to manufacture observable manifestations of pain or, worse yet, discourage them from exercising the right to appear before an Administrative Law Judge for fear that they may not appear to the unexpert eye to be as bad as they feel.

681 F.2d at 731.

Finally, the A.L.J. rejected the opinion of the long-term treating physician, Dr. Russell, in favor of the opinion of a one-shot examiner for the Social Security Administration, Dr. Millheiser. He did so despite an express statement from his own medical advisor that Dr. Russell would be the doctor better equipped to evaluate Plaintiff's disability.

■ Unless good cause is shown to the contrary, the A.L.J. must accord substantial weight to the opinion of the treating physician. *Wiggins,* 679 F.2d at 1389. In the instant case, the A.L.J. discredited Dr. Russell's opinions because they "do not take into effect the claimant's residual functional capacity based upon medical findings." He also states that Dr. Russell "did not pinpoint the basis for the multiplicity of complaints about pain." Dr. Millheiser, on the other hand (according to the A.L.J.) "took the pain into effect when he rendered his physical capacities evaluation." (R. 36).

■ The A.L.J.'s stated reasons for accepting Millheiser's opinion and rejecting Dr. Russell's do not bear scrutiny. First, Dr. Millheiser did not make a single statement about the degree of Mr. Banks' pain and its effect on work-related activities. (See R. 225–226). Second, Dr. Russell carefully pointed out the precise diagnosis which formed a medical basis for pain. The Social Security Administration medical advisor agreed that Mr. Banks' symptoms and stated complaints were completely consistent with those diagnosed. He also noted that Dr. Russell was in the better position to evaluate pain and that pain is a subjective matter, thus one person's tolerance may be very different from anothers. Finally, it is readily apparent that Dr. Russell's opinions did take the medical findings into effect in evaluating the RFC.

For all the foregoing reasons, it is Recommended that the decision of the Secretary be reversed, with a finding of disability. Thus, the Secretary should be ordered to reinstate benefits immediately as well as to restore all retroactive benefits due.

■ After the Court had completed its work on this case, the Secretary filed a motion to remand pursuant to the Social Security Disability Benefits Reform Act of 1984, Pub.L. 98–460 which became law on October 9, 1984. Section 2(d)(2)(C) of that Act provides that all cases seeking judicial review pending on September 19, 1984 which "relat[e] to medical improvement" are to be remanded to the Secretary for consideration under the new standards enunciated in the Act. This case is clearly one "relating to medical improvement." (See Brief In Support of Plaintiff's Claim at 18).

Under the new Act, disability benefits are not to be terminated *unless* substantial evidence shows (1) there has been medical improvement permitting the recipient to now engage in gainful activity; (2) the recipient has not improved but as a result of medical or therapeutic advances he is able to engage in gainful activity; (3) new

medical techniques show the individual is not as disabled as he was thought to be at the time of decision; and (4) the original decision was in error. Section 2.

Examining the standards of the new Act, it is apparent that no remand under that Act is warranted. First, the Court has recommended reversal on an entirely separate ground than that of failure to apply the "medical improvement" standard. As the District Court stated in *Stewart v. Heckler,* 599 F.Supp. 298 (S.D.N.Y.1984);

> [I]t would not be a rational construction of the new law to require a remand in a case where it is clear that benefits must be restored regardless of what findings may or may not be made on remand with respect to plaintiff's medical improvement. Certainly nothing in the legislative history of the amendment suggests that remand is required even in cases where any decision with respect to medical improvement will have no impact on plaintiff's right to receive benefits. Indeed, that legislative history, if anything, suggests quite the contrary.

*Id.* at 300.

Second, nothing in the Act changes any aspect of the law as applied in Plaintiff's case. Indeed, if anything, the new law is arguably more liberal in Plaintiff's favor. It would, therefore, serve no useful purpose to remand this case. Moreover, the extensive delay in this case—occasioned by the Secretary's loss of the transcript—warrants a final determination where Plaintiff is so obviously disabled. *See, Claassen v. Heckler,* 600 F.Supp. 1507 (D.Kan.1985).

For all the foregoing reasons, it is therefore RECOMMENDED that the decision of the Secretary be REVERSED, with direction to pay benefits from August, 1981.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation with the Honorable Eugene P. Spellman, United States District Judge, within ten (10) days after being served with a copy thereof.